IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>VIRGIN ORBIT, LLC,<br><br>Debtor. | Chapter 11<br>Case No. 23-10405 (KBO)<br>Case No. 23-10408 (KBO) |
| DR. TAMAS HAMPEL,<br><br>Appellant,<br><br>v.<br><br>VIRGIN ORBIT HOLDINGS, INC.,<br><br>Appellee. | C.A. No. 24-328 (MN) |

**MEMORANDUM OPINION**

Dr. Tamas Hampel – Pro Se Appellant

Robert S. Brady, Michael R. Nestor, Kara Hammond Coyle, Allison S. Mielke, Carol E. Thompson, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, DE – Attorneys for Appellee

March 31, 2025
Wilmington, Delaware

NOREIKA, U.S. DISTRICT JUDGE:

Pro se appellant, Dr. Tamas Hampel ("Appellant"), an equity holder in Virgin Orbit Holdings Inc.,[1] has appealed the March 6, 2024 decision (Bankr. D.I. 64, A1-A7)[2] ("the Memorandum Order") entered by the Bankruptcy Court in the chapter 11 case of Virgin Orbit, LLC ("Appellee"), which denied Appellant's motion (Bankr. D.I. 17) ("the Motion for Revocation") seeking revocation of the order (Lead Bankr. D.I. 610, A4399-4485) ("the Confirmation Order") which confirmed the chapter 11 plan proposed by Appellee and its debtor affiliates (together, "the Debtors"), on the basis that Appellant failed to establish that the entry of the Confirmation Order was procured by fraud. The appeal is fully briefed. (D.I. 7, 8, 20). Appellant also filed two motions to consider new evidence (D.I. 21, 23) ("the Motions to Consider New Evidence"), which Appellee has opposed (D.I. 22, 24). No party requested oral argument.

For the reasons set forth below, the Motions to Consider New Evidence will be denied, and the Memorandum Order will be affirmed.

I.  **BACKGROUND**

A.  **The Postpetition Sale Process**

On April 4, 2023 ("the Petition Date"), the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code. (A8, A49, A98, A146, & A194). Prior to filing the chapter 11 cases, the Debtors provided satellite launch services to domestic and international commercial and

---

[1] The chapter 11 cases of Virgin Orbit Holdings, Inc. and its affiliates, Virgin Orbit National Systems, LLC, Vieco USA, Inc., and JACM Holdings, Inc., were closed as of December 1, 2023. All motions and contested matters that remained open as of the closing of such cases, or that are opened after the date thereof, are administered in the remaining chapter 11 case of Virgin Orbit, LLC, Case No. 23-10408 (KBO).

[2] References the Bankruptcy Court docket are identified herein as follows: (a) docket entries in case number 23-10405 will be identified by "Lead Bankr. D.I. __" and (b) docket entries in case number 23-10408 will be identified by "Bankr. D.I. __." The appendix filed in support of Appellee's answering brief is cited herein as "A__."

government customers. (A243). After unsuccessfully marketing the company for sale in 2022, the Debtors filed for chapter 11 bankruptcy protection in early April 2023 facing an immediate liquidity crisis. The Debtors entered bankruptcy with the objective of maximizing value for all stakeholders through an expedited sale of substantially all of their assets pursuant to section 363 of the Bankruptcy Code.

To fund the chapter 11 cases, the Debtors' indirect parent entity, Virgin Investments Limited ("VIL"), which had invested significant capital into the Debtors and their operations to fund operating cash flow losses – more than $500 million in the last three years of the Debtors' operations, during which time the Debtors generated less than $45 million in revenue – agreed to fund debtor-in-possession financing ("the DIP Loan"), consisting of (a) an aggregate principal amount of up to $31,600,000 of "new money" loans, and (b) an aggregate principal amount of up to $42,500,000 in "rolled up" loans. (A262).

Following an uncontested hearing, the Bankruptcy Court approved the Debtors' proposed bidding procedures, including the form and manner of notice thereof to interested parties (Lead Bankr. D.I. 201) ("the Bidding Procedures Order"). (A1376). The Bankruptcy Court determined that the bidding procedures were in the best interest of the estates, fair, reasonable, appropriate, and reasonably designed to maximize value. (*Id.* at 3-4). The Bankruptcy Court also found that the form and manner of the sale notice were appropriate, sufficient, and reasonably calculated to provide proper notice of the auction, sale hearing, and the bidding procedures. (*Id.*).

Pursuant to the approved bidding procedures, the Debtors launched a postpetition marking process ("the Postpetition Sale Process") by contacting more than 200 potential bidders for the Debtors' assets, which built upon the Debtors' previous marketing and sale efforts. (A1749). As compared to the Debtors' prepetition sale efforts, the Postpetition Sale Process was highly publicized and designed to broadly solicit strategic and financial parties that sought to either

2

(a) purchase the Debtors' business and continue to operate it as a going concern, or (b) purchase the Debtors' assets for use or liquidation. (A1749). The Debtors provided all interested parties that executed non-disclosure agreements with a confidential information memorandum containing an overview of the Debtors' business, access to a virtual data room, which contained more than 1,000 files representing more than 21,000 pages of information, and where appropriate, access to the Debtors' management team, operational personnel, and facilities. (*Id.*).

Non-binding indications of interest were due on May 4, 2023. (A1750). As the Debtors publicly disclosed on May 8, 2023, the Debtors received over 30 indications of interest. (*Id.*). In addition, several parties that did not submit an indication of interest notified the Debtors that they were continuing due diligence and other financial and operational analysis towards a potential going-concern transaction, including up to and during an auction for the Debtors' assets. (*Id.*).

The Bidding Procedures Order originally set May 15, 2023 as the deadline for submission of bids for the Debtors' assets, which the Debtors, in consultation with various interested parties, subsequently extended to May 19, 2023 ("the Bid Deadline") (Lead Bankr. D.I. 249) (A1612). Ultimately, the Debtors accepted a stalking horse bid for the Debtors' modified Boeing 747 airplane in the amount of $17 million in cash but did not receive a stalking horse bid for the Debtors' other assets. (A1627).

Despite the Debtors' best efforts, including extensive prepetition and postpetition marketing processes, the Debtors were unable to identify a buyer who was willing to purchase the Debtors' assets as a going concern. (A1625). Because the Debtors had received indications of interest from potential bidders for several distinct groups of assets that included machinery and equipment, leases, an aircraft, and inventory, the Debtors, in the exercise of their business judgment and in consultation with various interested parties, determined that it would be beneficial to separate their assets into five segments and proceed with an auction for the sale of those five

3

segments. (A4164). The auction took place as scheduled on May 22, 2023 at the office of Debtors' counsel in New York and involved active bidding from various bidders over the course of more than 11 hours. (A1603). The Debtors declared four non-insider winning bidders, each for a distinct group of assets. The fifth asset group was not sold at the auction.

The Postpetition Sale Process ultimately yielded approximately $39.5 million in cash, pursuant to asset purchase agreements with five non-insider purchasers, which were all negotiated at arms' length by sophisticated parties that were represented by counsel. (A4606; *see* Lead Bankr. D.I. 364, 365, 378, 379, 465, & 481). Such asset purchase agreements were presented to the Bankruptcy Court by motion and upon notice to interested parties. (A4606; *see* Lead Bankr. D.I. 75, 204, 245, 249, 274, 279, 326, 334, 336, 339, 344, 347, 353, 360, 362, 364, 365, 366, 378, 379, 453, 456, & 481). The Bankruptcy Court held an evidentiary hearing on the sales. Evidence was submitted by the Debtors' investment banker, Ducera Partners LLC ("Ducera") and by the Debtors' CEO with respect to the marketing of the Debtors' assets, the competitive bidding process, the auction, the value of the winning bids, and the good faith, non-collusive behavior of the Debtors and the purchasers. (*See, e.g.,* Bankr. D.I. 340, 348, 369, 370). Based on this evidence the Bankruptcy Court approved the four sales ("the Sale Orders").

Thereafter, the Debtors selected a non-insider purchaser for the fifth and final group of assets. (Lead Bankr. D.I. 455). This purchaser participated in the auction but did not submit an acceptable bid. The Debtors continued negotiations with several parties following the auction and ultimately selected the purchaser as the successful bidder. (*See* Lead Bankr. D.I. 454). The Bankruptcy Court approved that sale as well. (Lead Bankr. D.I. 481).

In approving the five sales, the Bankruptcy Court ruled that, among other things, the notice of the Bid Procedures Order, sale, auction, objection deadline, and sale hearing was sufficiently provided to all interested parties, the Debtors acted in compliance with the Bid Procedures Order,

4

entering into the sales constituted a valid and sound exercise of the Debtors' business judgment, the Debtors and purchasers acted in good faith, and the consideration provided by the purchasers constituted the highest and best offers for the purchased assets. (*See* Lead Bankr. D.I. 364, 365, 378, 379, 481 (together, "the Sale Orders")).

Pursuant to these sales, the Debtors sold substantially all the Debtors' non-intellectual property assets along with a portion of the Debtors' intellectual property assets. (A4606). The Debtors assert that they were unable to identify any potential purchasers that were willing to purchase the Debtors' remaining intellectual property for more than de minimis value. The remaining IP Assets are central to the appeal.

Ultimately, the proceeds from the sales of the Debtors' assets were insufficient to satisfy the Debtors' substantial secured debt obligations. (A4606). Specifically, after application of sale proceeds to satisfy the DIP Loan obligations and administrative and priority claims, VIL held a secured claim in the amount of $28.4 million, plus a $39.0 million deficiency claim. (A4682). In addition, the Debtors' general unsecured claimants were owed more than $183 million. (A4682). All these claims have priority over the claims of equity security holders like Appellant.

**B.**    **The Chapter 11 Plan**

Having sold substantially all of their assets, counsel for the Debtors, counsel for the official committee of unsecured creditors appointed in the chapter 11 cases ("the Committee"), and counsel for VIL engaged in negotiations regarding the terms of a chapter 11 plan, and ultimately reached an agreement ("the Settlement"), which provided for, among other things, a recovery to holders of general unsecured claims, which were otherwise substantially out of the money. (A4118; *see* Lead Bankr. D.I. 460). The recovery to holders of general unsecured claims was made possible only by VIL's agreement to waive a recovery on account of its unsecured deficiency claims and allow holders of general unsecured claims to be paid ahead of VIL's secured claims.

This resulted in VIL receiving significantly less than full repayment on its senior secured claims, with an estimated recovery to VIL of only 45% of its total claim value. (A4118). The Settlement ultimately paved the way for a consensual plan confirmation process. The Debtors provided interested parties with notice of the Settlement, and its terms were incorporated into a joint chapter 11 plan (Lead Bankr. D.I. 96) (as amended, modified and supplemented, "the Plan"). (A1171).

In connection with solicitation of the Plan, on April 19, 2023, the Debtors filed a disclosure statement (Lead Bankr. D.I. 97; A1231-1375) that described in detail the liquidation value of the Debtors' assets, the proposed treatment of all claims and interests under the Plan, the cancellation of equity interests in the Debtors, and the Debtors' proposal to wind up their businesses and affairs. (A1231; *see* Disclosure Statement at 11).

On June 12, 2023, the Bankruptcy Court entered an order approving a revised disclosure statement (Lead Bankr. D.I. 438) in connection with a second amended plan (Lead Bankr. D.I. 439). Neither the disclosure statement nor the second amended plan provided for the Prepetition Secured Noteholder (VIL) to receive the remaining IP Assets on account of its secured claims. (Lead Bankr. D.I. 438-2 at p. 5 of 87 n.5; Lead Bankr. D.I. 439 at 24). On June 20, 2023, the Debtors filed a third amended disclosure statement and plan which also did not provide for VIL to receive the remaining IP Assets on account of its secured claims. (Lead Bankr. D.I. 459, 463, 465). This was the solicitation version of the disclosure statement and plan.

As there were insufficient proceeds to satisfy the Debtors' secured debt obligations, holders of interests in the Debtors, including Appellant, were not entitled to receive any distributions under the Plan and were, therefore, deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. (A4143). Only three classes of claims (Prepetition Secured Notes Claims, General Unsecured Claims, and Convenience Claims, each as defined in the Plan) were impaired

and entitled to receive or retain property under the Plan, and were, therefore, entitled to vote on the Plan. (A4143).

As to treatment of these claims and interests, the Plan allowed VIL's Class 3 claim in the principal amount of $28,400,000. It distributed to VIL in satisfaction of this claim cash and interests in a post-confirmation litigation trust. The Debtors projected that VIL would ultimately recover less than half of the claim attributable to its DIP Loan and nothing on its prepetition secured claim. Despite this meager recovery, VIL waived its resulting unsecured deficiency claim, which increased recoveries for general unsecured creditors. Holders of Class 4 general unsecured claims received their pro rata share of a cash pool in an amount no less than $1,100,000, certain other case, and interests in the post-confirmation trust. The projected recovery for this class was at best 1.29% to 5.46% of the claims. Class 5 general unsecured creditors that held "convenience claims" in an amount of $5,000 or less received a higher percentage but less than full payment. Equity interests in Class 9, like those of the Appellant, were canceled and extinguished.

The Ballot Certification was filed on July 26, 2023, two days prior to the scheduled plan confirmation hearing, indicating that the Debtors received votes from holders of claims in class 4 (General Unsecured Claims) and class 5 (Convenience Claims), and those classes of claims overwhelmingly voted to accept the Plan. (A4386; *see* Lead Bankr. D.I. 572). Also on July 26, 2023, the Debtors filed an amended proposed plan and blackline indicating that VIL would also receive on account of its secured claims "the rights to all IP Assets." (*See* Lead Bankr. D.I. 571 (Notice of Filing of Fourth Amended Joint Chapter 11 Plan, Ex. 1, at 24-25; *id*. at Ex. 2 (blackline) at 29)). The term "IP Assets" was defined to mean "all intellectual property assets owned by the Debtors (excluding any intellectual property assets that were sold pursuant to the Existing Sale Orders), including for the avoidance of doubt, the rocket engine and rocket avionics system intellectual property." (*Id*., Ex. 1, at 11). A subsequent version of the proposed plan

7

included also this treatment. (*See* Lead Bankr. D.I. 595-1 at 25). On July 28, 2023, the Bankruptcy Court held a hearing ("the Confirmation Hearing") to consider plan confirmation. (A4486-4560). There appears no dispute that Appellant had access to, and reviewed, the pleadings filed in the chapter 11 cases but did not object to entry of the Confirmation Order. No other party raised an issue with respect to the IP Assets at the Confirmation Hearing. (*See id.*). After providing parties in interest an opportunity to be heard and upon review of the pleadings and the record of the chapter 11 cases, the Bankruptcy Court entered the Confirmation Order.

Under the Plan, a plan administrator was appointed to wind up the Debtors' affairs, liquidate remaining assets, reconcile claims (other than General Unsecured Claims, as defined in the Plan, which were assigned to a litigation trust), and make distributions. (A4450-51, Plan at 31–32). In accordance with the Plan, all rights to the remaining IP Assets were transferred to VIL, as the Prepetition Secured Noteholder, or its designee. (A4608).

### C.   The Motion for Revocation

On December 27, 2023, five months after the entry of the Confirmation Order and the occurrence of the effective date of the Plan, Appellant filed the Motion for Revocation, which was styled as a notice of objection to the Plan pursuant to section 1144 of the Bankruptcy Code. (A4585). The Bankruptcy Court deemed the objection to be a motion for revocation of the Confirmation Order pursuant to section 1144 of the Bankruptcy Code. (A4).

On January 23, 2024, Appellee filed an objection to the Motion for Revocation (Bankr. D.I. 30) ("the Objection"), arguing, among other things, that (a) there was no basis to revoke the Confirmation Order; (b) the Motion for Revocation amounted to untimely and improper sale and confirmation objections; and (c) the Motion for Revocation raised considerations that were irrelevant to the Bankruptcy Court's determination of whether to revoke the Confirmation Order pursuant to section 1144 of the Bankruptcy Code. (A4603).

On February 7, 2024, the Bankruptcy Court held an evidentiary hearing on the Motion for Revocation ("the Evidentiary Hearing"), which was joined by other equity holders, at which time the Appellant offered into evidence, over the objection of Appellee, a video allegedly created by the Debtors prior to the bankruptcy highlighting their anticipated success. Appellant had also offered a series of news articles that report the alleged prepetition value of the Debtors, the private and public sector interest in the Debtors' technology and similar technologies, and the Debtors' successful satellite launches. Appellant also cited the Debtors' statements regarding indications of interest prior to the auction and promotional materials that advertised the Debtors' value. Appellant presented no evidentiary witness or valuation. Appellant generally argued that the remaining IP asset were of a unique and valuable nature, that those assets were not marketed properly and deliberately undervalued, and that VIL's participation as DIP lender and its receipt of the remaining IP Assets presented a conflict of interest. (*See* A4660-4674, A4684-4686).

The Debtors argued that there had been no showing of any false or materially misleading statement in connection with plan confirmation, and the time to object to the marketing and sale process had long passed. With respect to the specific allegation that the Debtors failed to market the remaining IP Assets, the Debtors argued that they ran a public and standard marketing and sale process and did not receive binding bids of any material value for the IP assets, aside from the IP assets that were related to the sale of other assets under the Sale Orders, and that those representations had not been challenged at the time the Sale Orders were entered. (A4682-4684). The Debtors argued that they relied on the values provided by that market test, and that there had been no showing that the Debtors' reliance on the court-approved sale process was somehow inappropriate. (*See id*.). The Debtors pointed out that the equity holders were out of the money by nearly $250 million, and the marketing process provided no bids or other indications of value

9

that would have been in excess of that amount, nor had any contradictory evidence been submitted. (*See id*.).

The Bankruptcy Court took the matter under advisement. On March 6, 2024, the Bankruptcy Court issued the Memorandum Order. "Distilled to the simplest terms," the Bankruptcy Court observed, "the Equity Holders argue that the Debtors were dishonest about the value of the Remaining IP Assets so that VIL could obtain them without equity holders receiving their fair share. They do not identify with precision any alleged false representations regarding the requirements for plan confirmation under § 1129 that the Debtors made to obtain confirmation of the Plan." (Memorandum Order at 6). Although Appellant's arguments "minimally challenge[d] statements the Debtors made to support the Plan's compliance" with section 1129 confirmation requirements, such as good faith, the Bankruptcy Court could not "overlook the fact that [Appellant] did not submit evidence sufficient to show that the Debtors' statements were materially false." (*Id*.). The materials presented by Appellant did not amount to "persuasive evidence to prove the value of the Debtors' Remaining IP Assets at the time of confirmation, let alone that such value exceeded the amounts of claims senior to equity interests such that equity holders were entitled to obtain a recovery in these cases." (*Id*. at 7). Rather the record reflected that no actionable bids were received for the Remaining IP Assets and therefore they were not sold. (*See id*.). "There simply was not enough value in the estates to allow the Debtors' equity holders, who are behind unsecured creditors in the priority scheme, to obtain a recovery. This is an unfortunate, typical result in bankruptcy cases." (*Id*.). Accordingly, the Bankruptcy Court denied the Motion for Revocation of the Confirmation Order.

### D. The Appeal

On March 12, 2024, Appellant filed a timely notice of appeal. (D.I. 1). Appellant raises the following issues: (1) whether the Bankruptcy Court erred in denying the motion for revocation

under section 1144 based on alleged fraud, specifically misrepresentation and lack of transparency regarding the valuation of the Debtors' assets, and (2) whether the determination of asset value through the sale process was conducted in a manner that improperly undervalued the assets to the detriment of equity holders. (D.I. 7 at 5).

## II.     JURISDICTION

This Court has appellate jurisdiction to hear appeals "from final judgments, orders, and decrees." 28 U.S.C. § 158(a). The Memorandum Order is a final order. *See In re Taylor*, 913 F.2d 102, 104 (3d Cir. 1990) (holding an order is final and immediately appealable if it "fully and finally resolved a discrete set of issues, leaving no related issues for later determination").

The Court "review[s] the bankruptcy court's legal determinations *de novo,* its factual findings for clear error and its exercise of discretion for abuse thereof." *See In re Trans World Airlines, Inc.*, 145 F.3d 124, 130 (3d Cir. 1998). The Court reviews "grants or denials of relief under [Federal] Rule [of Civil Procedure] 60(b), aside from those raised under Rule 60(b)(4), under an abuse of discretion standard." *Budget Blinds, Inc. v. White*, 536 F.3d 244, 251 (3d Cir. 2008) (internal footnote omitted) (citing *Harris v. Martin*, 834 F.2d 361, 364 (3d Cir. 1987)). "An abuse of discretion exists where the [bankruptcy] court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact. *Goodwin v. Carickhoff (In re Decade, S.A.C., LLC*), 2020 WL 564903, at *4 (D. Del. Feb. 5, 2020) (quoting *In re In re Marvel Ent'mt Grp.*, 140 F.3d 463, 470 (3d Cir. 1998)). A finding of fact is clearly erroneous "only if it is completely devoid of a credible evidentiary basis or bears no rational relationship to the supporting data." *Advance Cap. Partners, LLC v. Rossmann,* 495 Fed. Appx. 235, 237 (3d Cir. 2012).

11

### III.   ANALYSIS

#### A.   The Motions to Consider New Evidence Must Be Denied

On September 17, 2024, Appellant filed the first of two motions requesting that the Court consider new evidence. The first Motion to Consider New Evidence (D.I. 21) asked the Court to consider a declaration submitted to establish the potential value of certain of the Debtors' assets ("the Pinter Declaration"). Appellant identified no legal basis for the relief requested in this motion. *See* Fed. R. Bankr. P. 8013(a)(2)(A) (requiring a motion to state with particularity the grounds for the relief, the relief sought, and the legal argument supporting it). Appellant argues that he was unable to obtain this expert declaration earlier "due to the sensitive and geopolitically complex nature of such declarations" and because "such valuations are subject to strict regulatory controls and sensitive security protocols." (D.I. 21 at 2).

The Pinter Declaration does not provide a competing valuation, but rather outlines the reasons why "Virgin Orbit's rocket, particularly the LauncherOne, holds significant importance in the realm of European national defense." (D.I. 21-1 at 1). For example, it states that "[t]he intellectual property (IP) assets of LauncherOne are integral to its high valuation." (*Id*. at 2). It states that "Virgin Orbit's technology is not only crucial for the USA but would also be highly beneficial for any European country in terms of national defense and security." (*Id*.). It further states that "[p]ossessing and utilizing such technology would provide significant strategic advantages, thereby justifying the $3.7 billion valuation." (*Id*.).

Although parties appearing pro se are afforded a greater degree of leniency and their pleadings are held to "less stringent standards than formal pleadings drafted by lawyers," pro se litigants must still "abide by the same rules that apply to all other litigants." *See Mala v. Crown Bay Marina, Inc*., 704 F.3d 239, 245 (3d Cir. 2013). It is axiomatic that evidence not presented to the Bankruptcy Court should not be considered for the first time on appeal. This concept is rooted

in the tenets of fairness and finality. Appellant has requested that this Court review evidence for the first time on appeal that has never been subjected to cross-examination, is of unfamiliar origin, and could have previously been made available. *See Brokenbrough v. Capitol Cleaners & Launderers Inc.,* 2016 WL 125436, at *3 (D. Del. Jan. 8, 2016) (noting that "newly presented 'facts' that were available at the time of the original order, but were not then made of record . . . cannot support the grant of a motion for reconsideration") (citing *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985)). Appellant had the opportunity to present evidence in support of the Motion for Revocation, but never presented the Pinter Declaration, or any declaration, to the Bankruptcy Court. (*See* Memorandum Order at 7). The record reflects that the parties submitted a consensual scheduling order to govern briefing and the scheduling of a hearing, and the Bankruptcy Court scheduled not one, but two, status conferences in advance of the hearing on the Motion for Revocation for the purpose of allowing Appellant to ask questions regarding preparation for the hearing. (*See* Bankr. D.I. 18; Feb. 1, 2024 Hr'g Tr. (A4621-4630); Feb. 6, 2024 Hr'g Tr. (A4631-4654)). As the Pinter Declaration was never considered by the Bankruptcy Court, and Appellant had ample opportunity to offer such evidence but failed to do so, such evidence is not properly part of the record presented to this Court.

On December 3, 2024, Appellant filed the second Motion to Consider New Evidence. (D.I. 23). In this motion, Appellant sought relief under Rule 60(b) of the Federal Rules of Civil Procedure, asking the Court to consider "newly identified evidence" in the form of a video interview of Daniel M. Hart (the now former CEO of Virgin Orbit) which "supports the value, uniqueness and utilization of this IP Assets by Virgin Group." (*Id*. at 2). In the video, Mr. Hart addresses a question regarding "launch one technology," which is presumably part of the remaining IP Assets, and states that it is being licensed to other companies and has potential for various uses. According to Appellant, "[t]his statement unequivocally confirms that Virgin Group

13

owns, licenses, and actively utilizes the technology at issue" and "corroborates the Appellant's prior assertions regarding the value and uniqu[e]ness of the IP Assets." (*Id*. at 3).

Neither motion meets the requirements of Rule 60(b)(2) regarding newly discovered evidence. The Third Circuit has held that a motion under Rule 60(b) should be granted only where extraordinary circumstances justify the relief. *Budget Blinds*, 536 F.3d at 255-56; *see also Pelino v. Wetzel*, 2023 WL 20861, at *2 (3d Cir. Jan. 3, 2023) (denying Rule 60(b) motion where appellant failed to show extraordinary circumstances and finding motion was "essentially an effort to re-litigate the merits" of the appellant's amended complaint). Appellant has not established that the information contained in the video was unavailable to be presented to the Bankruptcy Court, and there are no extraordinary circumstances to justify consideration of the Hart video. Importantly, Mr. Hart, as Virgin Orbit's CEO during the chapter 11 cases, submitted evidence in support of chapter 11 cases and entry of the Sale Orders in the Bankruptcy Court and was available for cross-examination. (*See* A-2660; A-3615; A-3870). Appellant failed to cross-examine Mr. Hart. Thus, an interview of Mr. Hart, given long after the closing of the sale of the IP Assets and confirmation of the chapter 11 Plan, is insufficient to carry Appellant's burden under Rule 60(b)(2).

More importantly, the value of the IP Assets is irrelevant to the sole issue on appeal: whether the Bankruptcy Court erred in determining that Appellant failed to establish, pursuant to section 1144 of the Bankruptcy Code, that the Confirmation Order was procured by fraud. I agree with the Bankruptcy Court that valuation evidence is not germane to whether the Confirmation Order had been procured by fraud pursuant to section 1144 of the Bankruptcy Code – the only issue properly raised by the Motion for Revocation. (*See* Memorandum Order at 6 ("pre-confirmation sales are irrelevant to the inquiry that the Court must undertake under section 1144 to determine whether to revoke the Confirmation Order. Section 1144 allows a court to revoke a confirmation order if and only if such order was procured by fraud.") (internal quotation marks

omitted)). This Court's review would not be assisted by consideration of either the Pinter Declaration or the Hart video. Accordingly, Appellant's Motions to Consider New Evidence must be denied.

### B.     Appellant Failed to Satisfy the Standard for Revocation of the Confirmation Order

A court may revoke a confirmation order under section 1144 of the Bankruptcy Code "***if and only if*** such order was procured by fraud" on the court. *In re Melinta Therapeutics*, 623 B.R. 257, 263 (Bankr. D. Del. 2020) (emphasis added). Section 1144 of the Bankruptcy Code does not provide the standard for establishing fraud. Courts have construed section 1144 to require a showing of actual fraudulent intent. *In re Zolner*, 249 B.R. 287, 293 (N.D. Ill. 2000) (citing *In re Longardner,* 855 F.2d 455, 461 (7th Cir. 1988)). To demonstrate actual fraudulent intent, a movant must establish: (1) that the debtor made a representation regarding compliance with 11 U.S.C. § 1129, which was materially false; (2) that the representation was either known by the debtor to be false, or was made without belief in its truth, or was made with reckless disregard for the truth; (3) that the representation was made to induce the court to rely upon it; (4) that the court did rely upon it; and (5) that as a consequence of such reliance, the court entered the confirmation order. *In re Melinta*, 623 B.R. at 263-64 (citing *In re Tenn-Fla Partners*, 170 B.R. 946, 967 (Bankr. W.D. Tenn. 1994)).

To prevail, a movant must specifically allege facts showing fraud. *In re Northfield Lab'ys Inc.*, 467 B.R. 582, 588 (Bankr. D. Del. 2010) (citing *In re Longardner*, 855 F.2d at 461–62 ("[w]ithout a specific showing of the requisite fraudulent intent, the bankruptcy court had no authority under section 1144 to revoke its confirmation order.")); *see also* Bankruptcy Rule 7009 (adopting rule 9(b) of the Federal Rules of Civil Procedure, requiring that a cause of action for fraud be plead with particularity). In determining whether there is fraud on the court, "[t]he important inquiry is whether the fraud harmed the integrity of the judicial process, not whether the

15

fraud prejudiced a party or caused economic loss." *Official Comm. Of Unsecured Creditors v. Michelson*, 141 B.R. 715, 726 (Bankr. E.D. Cal. 1992). As the Bankruptcy Court noted, "[t]his standard is high to protect the finality of confirmation orders." (Memorandum Order at 6.)

The record reflects that Appellant did not specifically allege any instances of fraud, nor did he present any persuasive evidence to support his claims. (*See id.* (noting that "[the Equity Holders] do not identify with precision any alleged false representations regarding the requirements of section 1129 that the Debtors made to obtain confirmation of the Plan. . . . Notwithstanding the liberties the Court takes on behalf of the Equity Holders' arguments, the Court cannot overlook the fact that they did not submit evidence sufficient to show that the Debtors' statements were materially false.")).

Appellant makes many unsupported allegations, including that the Debtors and their advisors wrongly obfuscated critical information necessary to participate in the chapter 11 cases; the Debtors implicitly acknowledge the "difficulty in disputing" Appellant's arguments; the Debtors received actionable going concern bids, which they failed to act upon; and the Debtors made false representations to the Bankruptcy Court. Appellant fails to cite any evidence in the record to support any of these allegations.

Appellant's remaining arguments are unavailing. Appellant does not argue that he did not receive notice of the Bidding Procedures, Disclosure Statement, proposed plans, or the Confirmation Hearing. Rather, central to this appeal are Appellant's contentions that the asset sales were "complex" and "accelerated" such that equity holders did not have access to information to allow them to meaningfully participate in the sale process, leaving them with an "inability to inquire into or challenge the terms and adequacy of the bids." (D.I. 7 at 9; D.I. 20 at 3-4). These arguments are unpersuasive.

The record supports that the Debtors' failed prepetition attempts to locate an asset purchaser and their ensuing liquidity crisis precipitated the filing of the chapter 11 cases. The record supports significant efforts to undertake a marketing process to sell the Debtors' businesses as a going concern or maximize the value of the Debtors' assets through sales. The record supports that the assets sales in these cases were all approved by separate motion with notice and an opportunity to object. And the Plan's allocation of remaining IP Assets to VIL, whose claims were significantly impaired, went unchallenged by any stakeholder, including the Committee (which represented the interests of unsecured creditors whose claims were also significantly impaired under the Plan) or the equity holders.

Appellant argues that the Debtors "last-minute" addition of the plan provision allocating to VIL the remaining IP Assets as part of its recovery for its secured claims, which change was made two days prior to the plan confirmation hearing, together with the Debtors' statements that the value of the remaining IP Assets was "de minimis," is evidence that the Debtors "concealed the real value of these assets" as fraud upon the Bankruptcy Court. (*See* D.I. 20 at 12-14). But there was no evidence that these assets were not marketed and no competing valuation for the Bankruptcy Court (or this Court) to consider. The Court does not wish to minimize the significant losses to investors; that these assets did not find a purchaser during a chapter 11 cases is unfortunate but not an uncommon outcome. The Court is also sympathetic to the challenges of representing oneself pro se in the context of complex and fast-paced bankruptcy proceedings. That said, pro se litigants must still abide by the same rules that apply to all other litigants, and there was nothing improper about making this change to the plan, which was unchallenged by any party in interest, and where all efforts to sell these unique assets prior to plan confirmation had been exhausted.

Appellant argues that "the IP assets were not properly valued as no actionable bids were received, which would allow the determination of the value of . . . the core IP Assets." (D.I. 20 at 5). Thus, it is the "non-sale" of these assets that Appellant challenges. The Bankruptcy Court found that there was insufficient evidence to conclude that any statements the Debtors made in connection with entry of the Confirmation Order – including the Plan's assignment of the IP Assets to VIL – were materially false or amounted to fraud. Rather, the Bankruptcy Court found unpersuasive Appellant's evidence of purported misrepresentations regarding the value of the assets at the time of confirmation and determined that the value of the Debtors' assets was established by the marketplace after an open and fair sale process. Such a determination was not clearly erroneous.

Finally, Appellant argues, for the first time, that equity holders were improperly denied the right to vote on the Plan. (D.I. 7 at 9). "Absent exceptional circumstances, th[e] Court will not consider issues raised for the first time on appeal." *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 261 (3d Cir. 2009); *see also In re Caribbean Petroleum Corp.*, 580 F. App'x 82, 90 (3d Cir. 2014) ("We decline to address the substance of these arguments because they were not raised before both the Bankruptcy Court and the District Court, and therefore are waived.). Even assuming this argument was properly raised in the Bankruptcy Court, no vote was required for equity holders. Under section 1126(g) of the Bankruptcy Code, holders of claims and interests are deemed to reject a chapter 11 plan where, as here, such holders will not receive or retain property under such plan. As there was no requirement to give equity holders an opportunity to vote, the failure to do so is not evidence of fraud.

### IV. CONCLUSION

For the reasons set forth herein, the Motions to Consider New Evidence will be denied and the Memorandum Order will be affirmed. An appropriate order will be entered.